Good morning, Your Honors. May it please the Court, I am Norman Monheit, counsel for Appellant Brad Gold. I have with me at counsel table my partner, Brad DeLue. I've asked to reserve four minutes for appellant. No problem, thank you. With briefs, you've got a lot of hills to climb. You've got loss causation, you've got scienter, and then you've got the question of whether Rule 17, 10B.17 confers individual rights. But why don't we start with loss causation. On what grounds is the New York Stock Exchange decision to have an ex-distribution date and failure to give notice of Ford? The standard for loss causation, Your Honor, is traditional tort principles. And we've cited the restatement section, which says that an intervening cause is a superseding cause only if it is not a normal consequence of the original action. It is our position that, when you first read this, the blank response one typically gets is that, okay, let's assume they should have given notice, they didn't, it was negligent, and then somebody else comes in, unbeknownst to them, and does something that that somebody else, in this case the New York Stock Exchange, arguably didn't typically do. But how does that make Ford liable for the intervening acts of the NYCE? Your Honor, respectfully, there are a couple of factual assumptions in the question you just asked. Okay. One is that the stock exchange act completely independently of Ford. They may have, they may not have, we simply don't know that on this record. But the other factual assumption Hold on. That's a very important thing. If we don't know what would have happened, and the burden of proof is on your client, which I think everybody acknowledges is the case, doesn't that mean you've got a failure of proof when it comes to the loss causation issue? Well, we are at the proof stage. This is a motion to dismiss. And we're entitled to the benefit of inferences from the complaint. And there's simply, there's simply nothing in the complaint about what interaction may or may not have occurred between Ford and But you still have to allege facts that the decision was foreseeable or due to deception or coercion. What facts did you allege to that? I disagree respectfully, Your Honor, that we have to allege that it's due to deception. The standard, again, they're talking Sure. It is, this is the standard practice of, we believe, the New York Stock Exchange in situations where Rule 10B-17 is not followed, that it takes action to correct what it regards as displacement in the marketplace. But listen, Your Honor, hold a second, because that, that is, that's sort of a key point on this issue, right? If it's, how are we, how are we to decide or know in any way whether what you've just said is accurate? You rely very heavily on the Speer Pharmaceutical case. And in that case, Judge Fornan was at pains to point out that there was a record about how the FDA would respond to a citizen petition in an ANDA case and that, therefore, it was 100 percent, well, it was highly predictable what the outcome of the filing of the petition would be. How, how are we faced with anything analogous in what you've pleaded here? Well, what we sought to do in the proposed Second Amendment complaint after Judge Stark's initial decision was addressed precisely at that point by talking about, by adding two paragraphs, I believe it was, to the fact that this is, this is what the, this is the typical practice of the first business day, which in the opinion of the committee shall be practical having regard to the circumstances pertaining. FINRA rule 1140C. Would that be relevant to what happened here? No, it certainly sounds like it would. I thought that the exchange was acting pursuant to its own rules in this instance and doing what it would typically do in a situation where it saw a market dislocations as a result of that. But if, if, that is the guts of this issue. Let me ask you, was there any thought that you should bring the New York Stock Exchange into this suit? As a defendant, no, Your Honor. And, and the reason they were, I mean, what's the reason for not bringing them in? In other words, you're saying that they went contrary to what they normally did in the way they acted here in setting the ex-distribution date and the due bill period? No, I'm, I'm, I'm perhaps not making myself clear, Your Honor. What the, what the exchange normally does is that it normally doesn't interfere with the normal three-day period for the ex-distribution date. It, what it did here, we view as not abnormal, indeed normal, in light of the fact that the requisite announcement wasn't given and there were market dislocations resulting from that. But, okay, if the requisite announcement wasn't given, let's say on the 20th or whatever, how does that lead to a loss that was caused by their failure to give that particular notice on the 20th? Back to loss causation, I, I don't get it. I'm sorry, Your Honor, I'm not following. Okay, how was, the failure to give notice is the mistake that you claim that Ford did? How did that mistake cause the loss? Mr. Gold? For Mr. Gold, when he sold between the time of the announcement and the time of the New York Stock Exchange later notice that day, and he sold, what, 13,800? Right. Mr. Gold's belief was that he would obtain the market price plus the distribution. And the New York Stock Exchange decision, which we regard as a normal consequence of, as that is defined within the restatement. Wait a minute, if he knew what the New York Stock Exchange was going to do, he would have waited until that afternoon or the next day to sell, right? Well, if he knew what the New York Stock Exchange was going to do, yes, but a normal consequence But you just said what the New York Stock Exchange did wasn't abnormal. I, I did. So why, if it wasn't abnormal, why would he not have waited an extra day? Well, the question is, what is, who is responsible? We're talking about the responsibility of Ford here. And Ford has the obligation to perceive how the stock exchange may react to its own failure to follow the records of SEC rules. Mr. Gold does not have that obligation, and there's nothing in the record to suggest what he knew or what he didn't know. So your, your assertion is, just to sum up if I can, that Ford should have known, and knowledgeable people in the market knew that the SEC, that the NYSE, NYSE would respond the way it did in light of the 10B17 violation, therefore it's not a superseding cause even if it's intervening. Is that right? That is correct. Okay. But why would Ford care? Why would Ford care about people in the marketplace when somebody sells? Yeah. Well, Ford has an obligation, in our view, to, first of all, follow the rules, and secondly, not create market dislocations. I mean, that's what this rule is about. Well, but Ford, Ford is distributing to the trust. Well, with knowledge that the trust is then going to turn around and distribute that money to holders like, like Mr. Gold. And there was no reason they couldn't have put in that very same press release if they had some urgency to issue a press release that day. The record date's going to be July 10th, July 11th, whatever the correct calculation would have been. There really is no reason? Because, and that's an important point. That takes us to the scienter question. They've argued on the Ford side, why would we have done something here the way they're alleging it? What possible motive would we have for trying deliberately to foul the market up and wreck Mr. Gold's plans? We have no motive for that at all, and therefore, there can't be scienter. What's your response to that? Well, there is no evidence of motive, and we're not relying on motive and opportunity. We're relying on circumstantial evidence of reckless or conscious behavior. So that's the scienter argument, and we're arguing that this is an extreme departure from the standard of ordinary care that was knowing that could be perceived as severely affecting the market for these securities, and it can, in fact, occur. Now, if I, I'm sure we'll hear from Mr. Morota here in a moment on this, but I understood from the briefing the response to that to be something to the effect of, look, you yourselves said we did it right 27 times, so we blew it once. You can't assume from a mistake that there's something more than a mere negligent mistake. You can't assume from that mistake that it's reckless or that it's ill-motivated or that it's deceptive in any way. That's what the PLSRA is all about. It's making plaintiffs come forward with something more than bare allegations that you're a bad person. They've got to come forward with particularity, and you haven't done it. And your response to that is? In this instance, Your Honor, the distribution was in excess of $5 a share. It represented a 12% increment to the market price of the security as it existed in the moment before that announcement. That type of announcement, we assert, could reasonably be perceived as spurring market transactions based on this information, and the enormous increase in volume that occurred in the market that morning is evidence that that is, in fact, what occurred. That is something, we assert, that Ford should have reasonably perceived, and that is what is reckless in this instance, that it violated a clear rule that it has known about for a long time in circumstances where it should perceive that there was going to be an adverse effect on the market price. Your logic then makes this a rule of strict liability. Any violation of 10B17 is going to result in a disruption of the market that means they're reckless. Is that the end we get to with your position? I don't believe so, Your Honor. Again, we have the factual background here of having followed it on 27 prior occasions. We have an increment that is very substantial. Most distributions are $0.05, $0.10, $0.15 a share. This is $5 a share. It's 12% of the market price of the security. That's something that people in the marketplace are going to respond to. With the market price of the security, I thought it was $50, right? I'm sorry, Your Honor. Was the market price of the security $50 per unit? It was in the low 40s immediately before the announcement. I would like to use something on 10B17, whether there's a private cause of action. Sure. We took two approaches there. The first one was based on this Court's decisions in Pittsburgh Terminal and Lowry, and the second one was on 10B17 directly. Under Pittsburgh Terminal and Lowry, what we're really asserting is a 10B5 cause of action. The whole thing in Pittsburgh Terminal was that an issuer's failure to give the 10B17 announcement – let me start over – that 10B17 is a source of a duty to disclose, and that the issuer's failure to give the 10B17 announcement constitutes a material omission as a result of that duty to disclose. How do you get around the Central Bank of Denver, if that's your argument? Because that case seems to say the rules don't get to get out ahead of Section 10B in terms of private rights of action. So if it's not in the section, you don't get to run with it as a private right under the guise of a rule. Is that how you understand Central Bank of Denver, or am I misstating it? Well, I don't think that Lowry – and that's essentially their argument – I don't think that Pittsburgh Terminal and Lowry get out ahead of Central Bank of Denver for this reason. What 10B does – and the source of the cause of action here is 10B, it's not the rules, it's 10B itself, and the rules give color to that. And what Section 10B is about is deceptive or manipulative conduct in the marketplace in connection with the purchase or sale of securities. And 10B17 defines particularized conduct in a specific context as deceptive or manipulative. So your position is, and indeed has to be, that the mere existence of the violation of 10B17 is ipso facto a 10B violation. Always is, always will be. Because the rule defines it as manipulative and deceptive, and therefore, even with something which, if everybody agreed it was a clerical error, there was no malintent of any sort, by definition and by law, it would be a 10B violation. That's the position I'm hearing you take. No, Your Honor. What we would say is that there is a 10B5 cause of action. Under Pittsburgh Terminal, Lowry, there is a 10B5 cause of action available to a seller in Mr. Gold's position, provided he adequately pleads the other elements of Section 10B5. I might have misunderstood you there, and I'm sorry, Mr. Monahan. I'm not meaning to be obtuse. But I thought the arc of your argument was 10B17 defines a failure to give this 10-day notice period as manipulative and deceptive. There was a failure to give the 10-day notice. Therefore, by definition, this was manipulative and deceptive. Therefore, it's covered by 10B. Did I understand you right or not? What I was responding to, Your Honor, that is my argument, but I think you're taking it out of context with respect. What I was responding to was Your Honor's question that Pittsburgh Terminal is somehow an extension of Central Bank, and I'm arguing it's consistent with Central Bank, that 10B17 fits within 10B5. And am I correct that the logical end of your argument is that it never matters what evidence there is of intent, motive, anything else? By your line of argument, any mistake associated with 10B17. If you filed 9 days, 23 hours, and 59 minutes before, but not 10, the one-minute difference means, by law, you're manipulative and deceptive and your act is subject to liability under Section 10B. I do not agree with that, Your Honor. I think, respectfully, you're taking my argument well beyond where I've asserted it. Then if it's not an ipso facto kind of thing, 10B17, because it says manipulative and deceptive, is, as a matter of law, covering any error associated with it, what is your argument? If I've misunderstood you, what is the argument? Well, again, I was responding to Your Honor's question about whether Pittsburgh Terminal somehow goes beyond Central Bank. And my argument is that it doesn't because it is consistent with the manipulative and deceptive concept of 10B. The concern of Central Bank was going to secondary actors. And you would reject the way I just framed your argument as an illogical and an unfair extension, is that right? I think it's unfair, Your Honor. I wouldn't argue that it's illogical. Well, you don't want to go so far, right? In other words, it's not... Is that better than flipping it out? In other words, that can't be the law, right? I would not assert that that is the law. That is correct. Let me just start with the text of 10B17. It says that you have to give notice 10 days before of the record date of a dividend or distribution. And that notice is to be provided to the National Association of Security Dealers, the NASD. Which is now FINRA. Right. Why does it mention in the text that any individual investor has rights? It does not. It does not. And I'm sure when you look at how tough the Supreme Court has been in general, you know, cases like Gonzaga and a host of others, boy, it's tough to find individual creating rights that you can sue on based on the law that's now before us. Well, I'm glad you asked that question, Honor, because it gives me an opportunity to respond to the Angela Astor Three Rivers point. This gets into the issue where I think the district court got confused with respect to Judge Stark. The question of personal rights adheres in the statute, not in the rule. Agencies don't create personal rights. Congress creates personal rights. And it's well established that Congress created personal rights in Section 10B. And the question then I run into the problem of Stone Ridge, which the Supreme Court has said that they have very significant concerns about extending 10B as a private right of action, other than what they've heretofore done in 10B-5. Right. But what Stone Ridge was focusing on was, again, secondary actors in the marketplace, people who themselves had not made any representation to the marketplace and injected no information into the marketplace. And the court said that the market simply could not have relied on people of that particular class of defendants. True enough, but they spoke much more broadly than that, did they not? They said that they wanted to be, as Judge Ambrose just said, very restrained and they didn't want to extend rights under 10B-5 or a private right of action under 10B beyond where it's already gone. The language doesn't limit it to the question of secondary actors, does it? I mean, it's a case about secondary actors, but the broad holdings don't seem to contain that language, do they? Or maybe I misread it. No, I think there's certainly language one can read that way, Your Honor, in all candor. But what happened here, again, the statute creates the right. And what Angel Astro and Three Rivers teach is that we have to look to see whether the rule construes or fleshes out or fills in that right. And certainly one thing one can look to, the court can look to, is whether the rule has personal rights in it. But that's not the only thing the court looked to in Three Rivers. It looked to the holistic effort as what HUD in that instance was trying to create. Here, if you look at the issuing release that the SEC put out at the time it adopted the rule, it's very clear. We cited it in our brief. It's very clear that one of the concerns that motivated the SEC was, and I'm just going to read a piece of it, a concern about innocent buyers and sellers of suffered losses. I mean, they were focused on market participants among other things. They're trying to assure that market buyers and sellers are acting with complete information. So while the rule itself does not use specific personal rights language, I think it's very clear that the motivation that the agency had was protecting market participants. Well, we hear from your opponent, and we'll get you back to him on rebuttal. Thank you, Your Honor. Mr. Murata. Thank you, Your Honor, and may it please the Court, Sean Murata on behalf of the appellees. I think Judge Amber got it exactly right when he said that Mr. Gold has a lot of hills to climb. Even my mother never says I get it exactly right. Certainly not my clerks. But Mr. Gold certainly has a lot of hills to climb in this case. Any of the three issues that we've presented to you today are independent grounds to affirm the district court's judgment. But I think the cleanest way to affirm it for the appellees here is see enter, because although my friend on the other side disclaims it, the end point of his position is that anybody who blows a deadline, and in this particular case the Rule 10b-17 deadline, is, I think in his view, had see enter as a matter of law. Can I just go back to make sure I understand the facts? I had thought that the New York Stock Exchange had veered from its customary practice in the way it set an ex-distribution date and the due bill period. But it sounds like Mr. Murata was saying they didn't. Did they or didn't they? As I understand the complaint, what Mr. Gold is pleading is that had Ford given 10 days' notice, the New York Stock Exchange would have set the ex-date as June 28th. They would have done it differently. They would have done it differently. But I think what's important from the loss causation argument is that it was up to the New York Stock Exchange to decide what the ex-date would be. Their normal practice might be to set it two days before, but presented with Ford's press release, it was up to them and them alone to decide how they wanted to set the ex-date. Did they have a normal practice of what to do when there was not 10 days' notice? There was nothing pleaded in the complaint about that, and I'm not aware of any practice they have. They could have set it as June 30th in this case, and if they had set it as June 30th, Mr. Gold would have kept his distribution. It's only because they chose to set it as July 1st that he lost it. They did plead that this was a typical response, though, right? I mean, when you say you're not aware of any rule, they've pleaded that there is such a thing, in the sense of saying that NYSE's response was typical of what one would expect them to do in a circumstance like that. Is that enough for pleading purposes? I don't think it was enough, and I think he hasn't actually pleaded quite that. What he's pleaded is that if there were 10 days, it would have been set as June 28th. But what he didn't plead was that it would be typical for July 1st to be the date. And that's important because it's only because it was July 1st that Mr. Gold lost his distribution. And there's no suggestion that Ford had any input on whether it was going to be June 30th, July 1st, or something else. And, you know, what this Court said in Agravary, an opinion by Judge Roth, was that when you have that independent decision-maker who's not factually misled in any way, that is an intervening cause that breaks the chain of causation. It's a superseding cause as a matter of law. And that's what Agravary holds. So I think from Agravary, that settles the loss causation argument. The New York Stock Exchange is an independent decision-maker. We cite the D'Alessio case in our brief, which makes it clear that the New York Stock Exchange, when it acts in this way, is acting as if it were the Securities and Exchange Commission. And, in fact, the reason I would suggest that Mr. Gold didn't name the exchange as a defendant is because they have absolute immunity when they set X distribution dates. So that's why the New York Stock Exchange isn't a defendant. I figured it was something like that. What's the purpose of Rule 10b-17 if it isn't to protect investors? Well, it's, I think, twofold. First is to say that it helps the market function because, remember, Rule 10b-17 came out in 1970 when people wouldn't know instantly when somebody had announced a distribution. So the problem would be that brokers might give the distribution to the wrong person if they didn't know. And the second function is, and there are some cases where one could use the announcement of a distribution to influence the market. I mean, on its facts, Pittsburgh Terminal is a good example of that, where the company wanted to manipulate the distribution date because if they didn't know there was a distribution, they wouldn't convert their debentures. Therefore, they would avoid a registration they didn't want to make. So it's twofold. But I think Your Honor's questions got to it, which is to say that there's a difference between a rule benefiting a class of people and a rule that gives rights to a class of people. I read FINRA Rule 1140c to Mr. Monheit. Would the New York Stock Exchange have followed that rule? In this case, the relevant rule is New York Stock Exchange 235, which says that it shall set it in its discretion, essentially. So I think the two rules have to be followed. And it has the sole responsibility for it. And it has the absolute sole responsibility for it. It has no influence on that. From the podium, my friend suggested, well, there might be some sort of collusion between Ford and the New York Stock Exchange, and we don't know. But he hasn't pleaded that in the complaint. And if we know one thing from the actual holding of Twombly, it's the fact that one actor goes after another. There's no trace of inference, even under rule 8, that the two are in cahoots with one another. So I think that puts to rest any suggestion that Ford has influenced the New York Stock Exchange, in this case, by misleading or collaborating with them on this. Respond, if you would, to the arguments that we hear from plaintiffs' side about Speer Pharmaceutical. But there's law out there that tells you that predictable responses are responses that are not superseding responses. And their assertion is NYSE doing the kinds of things it did here was, in some form or fashion, a predictable response to Ford blowing the 10B17 rule. What's your comeback to that? Is Speer applicable or not? I think it's not applicable, because this falls within Agravery. I mean, you could say on the facts of Agravery that a district judge making an incorrect legal holding is a foreseeable result of an attorney who comes before that judge and argues for an incorrect legal holding. Judges typically make decisions based on the arguments put to them. But what this court held is that because the judge was the sole decision maker, right or wrong, it was a superseding cause. And of course, it's foreseeable that district judges make incorrect decisions. That's why appellate courts exist. If it wasn't foreseeable, then I guess we wouldn't have much of a reason to have appellate courts. But so the fact that it's foreseeable in some abstract sense, I don't think, takes you outside the rule of Agravery. So I think with respect to Speer, I think it perhaps misread the Agravery decision. But also I think on the facts of Speer, it's quite different. In there, there was a particular concern that litigants or parties were abusing the citizen petition process to influence the FDA, whereas here there's no suggestion that Ford was trying to work the ref by doing this the particular way it was or by presenting its press release when it did. The New York Stock Exchange did what it did as its own regard. In fact, in paragraph 17 of the complaint, the New York Stock Exchange made an announcement that said, hang on, everybody, we're going to have to decide when the X distribution date is. And then after due deliberation, made its decision. It made the decision four hours, I gather, after Ford made the announcement. There was, you say, an intervening hang-on announcement? Well, at about 9 o'clock, Ford released its press release. At about 11 o'clock or around noon, the New York Stock Exchange said, all right, we see there's this press release. We're going to have to decide what the X distribution date is going to be. And then at some later point, it said after due deliberation, we've decided the X distribution date would be July 1st. And that was around 1.30? Yes. So all these things happened without Ford's involvement as far as the complaint makes aware. And that, I think, settles the loss causation issue. But it also draws back to the Sienta issue because when it returns to motive, I mean, Ford doesn't care if Mr. Gold or his buyer is going to get this distribution. Does that matter? You know, you've heard the plaintiff's argument that we don't have to argue motive. Recklessness is enough. And given the amount of money that was on the table, ten times any of the other distributions, this was a big deal. And they should have known it was a big deal. And to treat it like it wasn't and blow the deadline can fairly be called reckless based on the pleading. What's wrong with that argument? Well, I think two responses to that. Of course, motive isn't absolutely essential. That's what Terav says. But what this court in GSC partner says is that where you don't have motive, the other facts have to be correspondingly greater. And there's nothing correspondingly greater here. With regard to recklessness, this court in Advanta made clear that recklessness isn't just negligence plus. It's deliberate recklessness. It's, you know, the executive who says, well, I don't know my statement's false because I don't bother myself to, you know, learn about what's going on at my company. It's an anti-ostrich defense. It's not a, you know, it's not a negligence plus sort of standard. So I don't think there's any suggestion from the complaint that, you know, there's nobody minding the store at Ford. So long as so far as the complaint reveals, there's only two facts. Ford met its deadlines in the past. Ford blew the deadline here. What caused it here? We don't know from the complaint. I mean, I've had discussions with my client that I'm not at liberty to reveal, but I can say that as far as the complaint reveals, we don't know what is going on at Ford. It could be there's a clerical mistake. It could be they're reading the rule differently than my friend does on the other side. All of those possibilities counsel against. If we don't know, is Mr. Monheit entitled under 12b-6 to have his version accepted until there's discovery? No, quite the opposite. What Taleb says is that admissions count against the pleader because this isn't just whether his, you know, whether his inference is plausible, but whether it's just as plausible as the non-culpable explanation. And that's what Congress wanted in the Reform Act. It didn't want every time you could arguably have a footfall by a company, people rush in and file a class action lawsuit. They wanted people to get the facts ahead of time. And they wanted those facts to show not just negligence, but actual malfeasance going on at Ford. And there is none of that in the complaint. And the problem is... Well, is there, is that in the complaint in the sense that they've said 10b-17 says what it says? 10b-17 defines a failure like this to be manipulative and deceptive. It happened. By regulatory definition, it is the sort of bad act covered by Section 10b. So we should get past the pleading stage. Where's the error in that framing of it? The error in the framing of that is scienter is a state of mind, not an action. And, of course, the SEC can't define what is going through Ford's head at the time it takes actions. So, and to the extent this was a per se liability, that would make Rule 10b-17, I think, beyond the scope of Section 10b because Section 10b itself requires scienter. That's what the court said in Aaron and Ernst and Ernst. So there has to always be a showing of that intentional, conscious, or reckless misconduct in this circumstance. And there just isn't. As far as I can tell, my friend's argument boils down to that any time someone misses 10b-17 after having previously adhered to it in the past, that is enough to get past the pleading. And I don't think the Reform Act would carry out its laudable goals of screening out meritless complaints if that were the case. The court might. I'm happy to talk about the private cause of action issue. And I think the questions get at both prongs of our position on that. The first is to say that what this court said in Three Rivers is that to discover whether an implied cause of action can be enforced through a regulation, you look at the language of the regulation. Because what it said at page 430 is that if the regulation doesn't speak in terms of personal rights, it doesn't construe personal rights. And my friend on the other side has conceded that this regulation does not speak in terms of personal rights. And so by the force of Three Rivers, that means it cannot be enforced through Section 10b's private cause of action. And the second part of our argument comes straight from Stonebridge, which is to say that the court has said, enough. We are done with expanding the Section 10b cause of action. We're not going to do it this way anymore. That if there's going to be an expansion, it has to come from Congress. And so what my friend is asking this court to do is create new liability for issuers, Rule 10b-17 liability that they've never been subjected to before. And the Supreme Court has said, don't do that. That if it's going to happen, let Congress do it. And if I can make one last point, it's that the SEC can enforce Rule 10b-17 on its own. It's not as if they thought there was something untoward here that they claim to have enforced it against Ford themselves. And as Stonebridge says, the enforcement power isn't toothless. That issuers do fear. Issuers are concerned about it. And the SEC can regulate it themselves without private individuals like Mr. Gold stepping up to do it for them. Unless the court has any further questions, we'd ask you to defer. Thank you very much. Mr. Monaghan. A few quick points. With regard to Ederberry, they keep characterizing this as a decision that is based exclusively on the independence of the judge. And I read Ederberry as saying this was an abnormal, extraordinary action by a district judge. This wasn't simply a situation where a district judge made a decision that this court wound up disagreeing with. It was rather remarkable, and I say this without meaning to be critical of the judge, a remarkable denial of due process. And in that sense, it was abnormal, extraordinary, and fit clearly within the restatement guidelines. And you're saying what the New York Stock Exchange did here under Rule 235 was not abnormal? That is correct. That is exactly right. Why was it not abnormal? I don't understand still. It was not abnormal because the Stock Exchange acts to adjust the due date in a situation like this where there are market dislocations resulting from the market not having had adequate advance announcement of the record date of the distribution. And you heard me ask Mr. Moreau about that, and he said they haven't pleaded that this is a typical response. And I look at paragraph 24 of your complaint. The proposed second amended complaint. The proposed second amended complaint. Thank you for helping me be precise about that. And you say, quote, had Ford provided 10 days advance notice of the distribution as SEC Rule 10B-17 requires, the NYSE would not have varied from its typical practice and would not have adjusted the X distribution date with regard to the distribution, close quote. So that's a statement that they had a typical way to behave and they varied from it, but it's not a statement that the way they varied was typical and predictable, is it? It does not use those words, Your Honor. But I think what we're trying to say there is that they did something here because of what was going on in the marketplace. But to get to where you want to get, doesn't the pleading have to say something like what you're trying to say happened in Speer, which is the response was a predictable response. But Ford having done what it did, it can't escape liability by pointing at the NYSE because what the NYSE did next was something people would know was going to happen based on what Ford did. Don't you have to have said something like that in the complaint? I think that is a perfectly reasonable inference from what we pleaded in paragraph 23 and 24. We didn't say it with that degree of explicitness, but I think that's the import of those allegations. With regard to Sienter, our obligation is to show inferences that are at least as compelling as opposing inferences. We submit that the inference of recklessness here in a situation where Ford knew about this rule, it's a bright-line rule, there's no interpretation involved, it's one that had followed in the past, it ignored it in this instance, and the market dislocations were reasonably perceivable. That's just as compelling an inference as the fact that somebody just innocently made a mistake. Finally, with regard to Three Rivers, I just want to comment again that the court did not look exclusively at the language of the rule there. They took a holistic view of what that regulatory structure was involved with. Again, here, if we want to know what the SEC was trying to accomplish with this rule, we just need to look at that release. Finally, we heard very little from my opponent about Pittsburgh Terminal. There really isn't, we submit, an effort to meaningfully distinguish that in the briefs heard argument today, and we submit that that is certainly a firm basis for a cause of action to establish law on the circuit. Thank you very much. Thank you to all the counsel. Very well done. We'll take the matter under advisement, and we'll take a ten-minute recess.